## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**NICHOLAS LAUDANI,**                          Chapter 13
　　　Debtor                                   Case No. 07-15355-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**NICHOLAS LAUDANI,**
　　　Plaintiff
v.                                             Adv. P. No. 07-1433
**TRIBECA LENDING CORPORATION,
FRANKLIN CREDIT MANAGEMENT
CORPORATION, MANHATTAN
FINANCIAL SERVICES, INC.,**
　　　Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion for Partial Summary Judgment (the "Motion") filed by Franklin Credit Management Corporation ("Franklin") and its wholly owned subsidiary, Tribeca Lending Corporation ("Tribeca")(collectively, the "Defendants").[1]  Through their Motion, the Defendants seek summary judgment with respect to seven of the twelve counts set forth in the Verified Complaint filed by Nicholas Laudani ("Laudani" or the "Debtor").

---

[1] The Clerk entered a default against the third defendant, Manhattan Financial Services, Inc., on February 5, 2008.

1

The Court conducted a hearing on both the Motion and the Debtor's Objection on November 5, 2008 and took the matter under advisement. The issues presented include whether the Defendants have sustained their burden of establishing the absence of genuine issues of material fact, and whether they are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c), made applicable to this proceeding by Fed. R. Bankr. P. 7056.

## II. PROCEDURAL BACKGROUND

The Debtor, acting *pro se,* filed a voluntary Chapter 13 petition on August 24, 2007. One month later, on September 24, 2007, he filed his Schedules. On Schedule A-Real Property, he disclosed an ownership interest in 29 Beechglen Street, Roxbury, Massachusetts, describing it as a four-family residence (the "Property").[2] The Debtor listed its value at $450,000, the same value ascribed to the property by the City of Boston for tax purposes. He added: ". . . [b]ut property 2 doors from mine at Foreclosure did not sell and was in better shape not even $400,000 [sic] Perhaps in todays [sic] Market a quick sale could be anywhere from $200,000 - $400,000." On Schedule D-Creditors Holding Secured Claims, the Debtor listed Franklin d/b/a Tribeca as the holder of a claim, but he stated on the schedule: "I rescinded August 15-07 - My notion is that it is now unsecured debt."

Shortly after filing his petition, the Debtor obtained the services of an attorney, and, on October 13, 2007, counsel filed a notice of appearance on his behalf. One day later, the Debtor filed amended schedules, as well as an amended Statement of Financial Affairs, and

---

[2] Laudani executed an Occupancy Certification on March 31, 2006 in conjunction with the refinancing of the Property in which wrote: "I occupy this 3 family."

2

an Amended Statement of Current Monthly Income and Means Test Calculation and

Calculation of Commitment Period and Disposable Income, which revealed that the Debtor

is a below median income debtor capable of proposing a plan with a three year

commitment period. *See* 11 U.S.C. § 1325(b)(3). On Amended Schedule A, the Debtor listed

the Property with a current value of $415,000, subject to a disputed secured claim listed on

Schedule D in the sum of $360,000.  On Amended Schedule B-Personal Property, the Debtor

did not disclose any claims or counterclaims against any of the Defendants.

On Schedules I and J-Current Income and Expenditures of Individual Debtor(s), the

Debtor listed income from employment as a "[l]oan officer-(strictl [sic] commission basis)"

with Metrocities Mortgage LLC in the net monthly sum of $729, as well as income from real

property in the sum of $3,400.[3]   On Schedule J, he disclosed expenditures of $1,108,

excluding any mortgage payment, resulting in monthly net income of $3,021. On his

Statement of Financial Affairs, he disclosed gross income of $40,000 in 2005; and *adjusted*

gross income of $8,450 in 2006, referencing line 4 from his federal income tax return,

namely 2006 Form 1040EZ.[4]

On October 22, 2007, the Defendants filed a Motion for Relief from the Automatic

---

[3] On Schedule G-Executory Contracts and Unexpired Leases, the Debtor listed one residential lease with an individual identified as Sheryl Brestos.

[4] The Chapter 13 Trustee objected to confirmation of the Debtor's Chapter 13 plan on the grounds that it is miscalculated and fails the best efforts test set forth in 11 U.S.C. § 1325(b)(1)(B).  At hearing held on January 8, 2009, the Court sustained the Trustee's Objection by agreement and ordered the Debtor to file an amended Chapter 13 plan within thirty days.

3

Stay Pursuant to 11 U.S.C. § 362 (the "Lift Stay Motion"). The Debtor objected to the Lift

Stay Motion. On November 1, 2007, he also objected to Tribeca's proof of claim, which

Franklin filed as its servicer, in the amount of $421,151.15,[5] on the grounds that "pre-

petition, Laudani validly exercised his right, pursuant to the Truth in Lending Act, to

rescind the mortgage loan transaction," leaving Tribeca with an unsecured claim. The

Debtor also objected to the amount of the claim on the ground that it contained fees and

charges and "other amounts not provided for by the underlying contract."

On December 13, 2007, the Court consolidated both the Debtor's objection to

Tribeca's proof of claim and the Debtor's objection to the Defendants' Lift Stay Motion with

the adversary proceeding commenced by the filing of the Verified Complaint. In his

Verified Complaint, the Debtor set forth twelve counts against the Defendants arising out

of a refinancing transaction with Tribeca that occurred on May 3, 2006 as follows: Count

I - Fraud; Count II - Violations of Truth in Lending Act and M.G.L. ch. 140D; Count III -

Violation of M.G.L. ch. 184, §§ 17D and 17B and Chapter 93A; Count IV - Borrower's

Interest; Count V - Negligent or Intentional Misrepresentation; Count VI - Economic

Duress; Count VII - Breach of Contract and of Servicing Regulations; Count VIII -

Unconscionability; Count IX - Violation of HOEPA and M.G.L. ch. 183C; Count X

Violations of Servicer Act; Count XI - Chapter 93A; and Count XII - Emotional Distress.

As noted above, Tribeca seeks summary judgment with respect to Counts II, IV, VI, VII,

VIII, IX and XII.

---

[5] Franklin set forth a prepetition arrearage in the sum of $67,444.89.

4

## III. MATERIAL FACTS

The following facts are derived from the Debtor's Verified Complaint, the Debtor's Affirmation in Response to Defendants' "Undisputed Facts," and the Debtor's Supplemental Affirmation in Support of Objection to Defendants' Motion for Partial Summary Judgment, as well as Affidavits submitted by the Defendants, namely, the Affidavit of Kevin P. Scanlon ("Scanlon"), containing transcripts from the depositions of the Debtor and Robert J. Walsh ("Walsh"), the principal of Manhattan Financial Services, Inc. ("Manhattan"), the mortgage broker involved in the loan transaction with Tribeca, as well as other documents; the Affidavit of Karen A. Waite ("Waite"), a paralegal with the law firm of Aloisi & Aloisi; and the Affidavit of Bruce I. Miller ("Miller"), who was practicing with the law firm of Aloisi & Aloisi in May of 2006 and who was the Settlement Agent at the closing which precipitated the Debtor's adversary proceeding against the Defendants.

In his Verified Complaint, the Debtor stated that he acquired the Property in 1986. Excluding the transaction with Tribeca, the Debtor refinanced the Property twice after purchasing it.  In July of 2000, he obtained a loan secured by a first mortgage on the Property from Homecomings Financial ("Homecomings").  The interest rate on the note secured by the Homecomings mortgage was 11.4%.  In May of 2005, the Debtor obtained a second mortgage on the Property in the amount of $100,000 from the Carpenter Trust, which, in the Debtor's words, is a "hard money" lender, using Manhattan's services as a mortgage broker.  At his deposition, Laudani testified that the interest rate payable to the

5

Carpenter Trust was 18%. The Debtor described "hard money lending" as "strictly asset-based lending with no consideration to your ability to pay it back . . . ."

In his Verified Complaint, the Debtor represented that he expected to receive a $5,000 construction fund from the Carpenter Trust loan, but that the Carpenter Trust withheld cash, making it impossible for him to renovate the Property for rental purposes. As a result, according to Laudani, he was unable to make monthly mortgage payments, and Homecomings initiated foreclosure proceedings in December of 2005.  It scheduled a foreclosure sale for May 5, 2006.  At his deposition, the Debtor elaborated about the loan from the Carpenter Trust.  He testified that, although the purpose of the loan was to rehabilitate his Property, he used the cash proceeds from the loan instead to pay bills and start an internet company which failed.

In early December of 2005, knowing that he was in financial trouble, and, at a time when he was employed as a Senior Loan Officer with Mortgage Pros USA, Laudani contacted Manhattan "for a refinancing and indicating that he was interested in a 'cash out' transaction so that he could complete renovations of his home."

The Debtor contradicted that representation, which is contained in his Verified Complaint, in his Affirmation in Response to Defendants' "Undisputed Facts."  In his Affirmation, the Debtor stated that Robert Zimmerman, the trustee of the Carpenter Trust contacted Walsh, Manhattan's principal, and asked Walsh to contact him about refinancing his Property.  Walsh, in his deposition testimony, rejected that notion and testified that the Debtor contacted him.  Additionally, Walsh testified that he was not and is not an agent

6

of Tribeca and at all times acted as an independent contractor in the refinancing transaction

at issue. Although the Debtor stated that, upon information and belief, Tribeca "only uses

mortgage brokers that it has selected and approved in advance," he did not rebut Walsh's

testimony that he was an independent contract vis à vis Tribeca.

On or around December 20, 2005, the Debtor sent Walsh a note by facsimile.  On the

facsimile cover sheet, which reflected the name of his employer, Mortgage Pros USA, the

Debtor stated the following:

> Mr. Zimmerman is very interested in this as you know.  Anyways here is a
> copy of my info.
> See what you can do
> LTV    60%
> No Income, No Assetts [sic], No Employment
> Loan Amount         $335,000
> Value               $675,000

The Debtor testified at his deposition that, because he had "a couple of 90-day-lates [sic],"

few lenders were going to consider refinancing the Property "below 70 percent" and that

he was limited in the number of lenders who would work with him, although "cash out

was a possibility." Additionally, he testified that he proposed three different scenarios to

Walsh involving loans in the amounts of $360,000, $365,000 and $390,000 and sent him

"three different application Type 1003's" in those amounts.   In his Supplemental

Affirmation, Laudani represented that despite his employment as a mortgage broker, he

did not believe he was "anymore 'sophisticated' that the average person looking to

refinance" and that he did not know "what documents or disclosures were required by law

to be given."  He disclosed that he had attended Berklee College of Music and the New

7

England Conservatory of Music, without receiving a degree from either institution. He also indicated that he became employed in the mortgage financing business in 2003 or 2004 because a friend told him "how lucrative it was." The Court finds, however, that the Debtor's employment in, and familiarity with terminology used in the mortgage lending industry, including that used in his fax to Walsh and at his deposition, is simply contrary to his representation in his Supplemental Affirmation that he was no more sophisticated than the average person looking to refinance.

On February 23, 2006, Manhattan faxed a "<u>Liberty Loan Scenario Request</u> No Income, No asset, No Fico" form to Tribeca on Laudani's behalf. That form set forth a loan amount of $340,000. It also contained disclosures that the Debtor acquired the Property in 1990 for $150,000, that the Property was subject to liens in the amount of $330,000 and that it had a value of $620,000. Manhattan then forwarded various forms to Laudani for his signature. Although the Debtor testified that he did not recall receiving a letter dated March 7, 2006, on that date, a Manhattan employee, Maidy Hoyland, sent him a letter stating that she had received his disclosures but certain forms were missing or altered. She returned all forms to him requesting that he return them signed and "unaltered" as soon as possible. She advised: "As of right now, I am suspending activities on your loan request until I have received all attached Disclosures." As of March 29, 2006, Manhattan was still in need of further information from Laudani. Walsh notified him by fax, indicating that he needed verification of Laudani's social security number and employment. Walsh stated: "We only have <u>8</u> <u>days</u> left for fullfilling [sic] pre approval conditions . . . <u>Send</u> <u>Back</u>

Disclosures!!

On April 9, 2006, Laudani signed a document captioned "Mortgage Broker Disclosures Required by the Attorney General's Consumer Protection [sic]," which set forth a loan amount of $360,000 with an Annual Percentage Rate of 15.95%. The Debtor did not dispute that Manhattan forwarded that document to him, as well as numerous other documents, prior to the May 3, 2006 loan closing. Although in his Verified Complaint, he stated his belief that "his signatures and dates on various documents were forged," he did not identify any instances where his signature was forged or dates were altered on the various documents set forth in Exhibit G to Scanlon's Affidavit which the Defendants submitted in conjunction with their Motion for Partial Summary Judgment.

In his Verified Complaint, the Debtor stated unequivocally in several different numbered paragraphs that he never received a loan application or a Good Faith Estimate from either Manhattan or Tribeca prior to the closing and that he was unaware of the identity of the lender until late April of 2006. The Debtor, as part of the package of documents forwarded to him by Manhattan, however, signed and dated a "Borrower's Certification & Agreement" on March 31, 2006 in which he acknowledged that he "applied for a mortgage loan through Manhattan Financial Services, Inc." and that "[i]n applying for the loan I/we completed a loan application containing information including, but not limited to the purpose of the loan, the loan amount, source of the down payment, employment and income information, assets and liabilities. . . ." Additionally, he signed an "Affidavit and Acknowledgment from Borrower," which was part of the package of

9

documents sent to him by Manhattan.  In signing that document, which identified Tribeca as the Lender on the first line, Laudani acknowledged that "I/We have received the Good Faith Estimate and all required federal copies of which are annexed [sic], and acknowledge having received such forms from Manhattan Financial Services, Inc. within 3 days of my/our application date."  The Debtor did not directly address the documentary evidence submitted by the Defendants with his signature, relying only on his Verified Complaint and Affirmations.

In his Verified Complaint, the Debtor also represented that Manhattan requested an appraisal of his Property.  According to Laudani, he "obtained an appraisal from A.C. Klein Appraisal Assoc. ("A.C. Klein") dated January 9, 2006 . . . [which] . . . stated the value of his house at $620,000."  Laudani further alleged that he e-mailed the appraisal to Manhattan on February 14, 2006 and paid the $450 appraisal fee with a cash payment of $250 and a credit card payment of $200 on March 10, 2006.[6]

Laudani represented in his Verified Complaint that he was seeking $60,000 in cash out of the refinancing and that Manhattan assured him that he had plenty of equity and "could get a cash out of $25,000 - $65,000." He stated that he informed Manhattan of how he intended to use the cash to renovate the Property.  Additionally, he represented that he asked Manhattan to provide him with state and federal disclosures, but he "did not get any

_____

[6] The Debtor and Walsh executed, on or around March 31, 2006, two copies of a Loan Origination and Compensation Agreement which provided for an origination fee of 3% of the loan amount of $360,000 ($10,800), a $600 processing fee, a $12 credit report fee, and approximately $102 in FedEx/Courier expenses.  The Agreement also provided "Third Party Appraisal Fee: Paid Outside of Closing."

disclosures relating to the loan before the closing, such as truth-in-lending disclosures,

ARM program disclosure, good faith estimate, [and] Massachusetts Determination and

Documentation of Borrower's Interest."[7]

In his Verified Complaint, Laudani further represented that

> [o]n the date of the closing, which was documented May 3, 2006, Laudani
> was shocked to find, *inter alia*, that there was only $140.87 of cash to him on
> one HUD-1 statement; that the APR was below the interest rate; that he
> didn't see any variable interest rate disclosure; that the monthly payment
> was about $4,5550; that he was asked to sign two sets of HUD-1 statements
> and two sets of Truth-in-Lending statements; and that the payoff of
> Homecomings Financial was higher than expected.

Indeed, he stated that there were three different HUD-1 Settlement Statements at the

closing.  He also stated that he initially refused to sign the documents due to his concern

about "the conflicting information he was being given as well as his ability to make the

monthly payments."  Reminded of the pending foreclosure sale by the closing attorney

from the firm of Aloisi & Aloisi, he stated he "had no choice but sign the closing documents

to prevent the foreclosure."

In his Affidavit, Miller, the Settlement Agent, identified the documents Laudani

signed at the May 3, 2006 closing, stating:

> My general habit, routine and practice at a closing is to review the HUD-1
> Settlement Statement with the borrower first. I did that in this case. I usually
> start with the second page and then go to the first page.  A copy of the *final*
> HUD-1 Settlement Statement that was executed at the time of the closing is
> attached hereto as Exhibit A.  I signed the HUD-1 Settlement Statement on
> behalf of the lender.  Although the first page is not signed by the borrower,

---

[7] The Debtor's request for these specific disclosures undermines his assertion that
he was no more sophisticated than the average person seeking refinancing.

> to the best of my knowledge and belief, it is the *final* HUD-1 that used [sic]
> at the closing.

(emphasis supplied).   The two-page HUD-1 Settlement Statement submitted by the

Defendants contains both the Debtor's signature and Miller's signature on the second page.

The first page of the statement was neither initialed nor signed by the Debtor.   In addition

to signing only the second page of the HUD-1, the Debtor  signed, but did not date, a

Certification Addendum to the HUD-1, which provided:

> I have carefully reviewed the HUD-1 settlement statement and to the best of
> my knowledge and belief, it is a true and accurate statement of all receipts
> and disbursements made on my account or by me in this transaction.   I
> further certify that I have received a copy of the HUD-1 Settlement
> Statement.

Miller also signed the Certification attesting that "[t]he HUD-1 Settlement Statement which

I have prepared is a true and accurate account of this transaction.  I have caused or will

cause the funds to be disbursed in accordance with this statement."

At the closing, the Debtor signed and dated a Truth-in-Lending Disclosure

Statement.  It set forth an Annual Percentage Rate ("APR") of 12.419%, a Finance Charge

of $933,167.27, an Amount Financed of $340,496.11 and a Total of Payments of

$1,273,633.38.  The Debtor also  signed and dated a document captioned "Itemization of

Amount Financed" which referenced applicable lines on the HUD-1 Settlement Statement

submitted by the Defendants.  The itemizations, other than mortgage and lien payoffs and

an amount in the sum of $1,243.12 referred to as "Loan Proceeds to: Aloisi & Aloisi,"

totaled $4,652.38 and included the following items appearing on page 2 of the HUD-1

Settlement Statement: hazard insurance reserves ($585.68), property tax reserves

($1,302.12), an aggregate accounting adjustment (-$146.42), an appraisal fee ($275), title insurance ($900), a title search fee ($69), recording fees ($150 and $175), a fee for a municipal lien certificate ($25), and a hazard insurance premium ($1,317). The Itemization of Amount Financed also contained a reference to a Payoff Schedule prepared by Waite, the paralegal at Aloisi & Aloisi, which listed accounts that "<u>must</u> be paid off through escrow as a condition of the attached loan approval." Those accounts, which included sums due Homecomings and the Carpenter Trust totaled $334,600.61. The Amount Financed appearing on the Truth-in-Lending Disclosure Statement, namely $340,496.11, reflects the total of the mortgage and lien payoffs, together with the sum of $1,243.12 identified as "Loan Proceeds to: Aloisi & Aloisi," as well as the $4,652.38 in itemizations set forth above ($334,600.61 + $1,243.12 + $4,652.38 = $340,496.11). The Amount Financed, as noted, appears to be based on a payoff of $216,945 to Homecomings, as well as payments of $1,020 to M.P.T.N., $7,977 to NCO Financial, $107,356.50 to the Carpenter Trust, and $1,302.11 to the City of Boston for property taxes. It is unclear when Waite calculated the payoff to Homecomings because she received a Payoff Statement from Homecomings dated May 8, 2006, after the closing. It set forth a payoff of $217,905.57 with a per diem of $60.10, as well as a wire transfer fee of $20. In her Affidavit, she explained:

> The payoff of $334,600.61 listed on the Itemization of Amount Financed was an estimate of the payoff amounts. The actual payoff amounts were higher due to per diem interest charges. The final payoff figures are accurately reflected on the *final* HUD-1 Settlement Statement signed by Mr. Laudani *at closing*.

(emphasis supplied). Neither Miller nor Waite, however, explained why the Itemization

<div align="center">13</div>

of Amount Financed was not amended to correspond to the new payoff figures on the first page of the *final* HUD-1 Settlement Statement or why it did not clearly provide that it contained estimated figures.

The payoff to Homecomings set forth in the Itemization of Amount Financed in the amount of $216,945 is $1,258.75 less than the *actual* payoff amount appearing on the unsigned, first page of the HUD-1 Settlement Statement, namely $218 203.75,[8] which both Miller and Waite referred to as the *final* HUD-1 Settlement Statement, the second page of which the Debtor signed at the closing. The HUD-1 Settlement Statement also reflects sums which are different than those used in the Payoff Schedule prepared by Waite referenced on the Itemization of Amount Financed. For example, M.P.T.N. and NCO Financial were listed on the HUD-1 Settlement Statement as having claims totaling $4,875 in contrast to the Payoff Schedule which listed M.P.T.N as holding a claim in the sum of $1,020 and NCO Financial as having a claim in the sum of $7,977. Additionally, on the HUD-1 Settlement Statement, Miller listed a water and sewer lien in the sum of $1,500, excluded the property tax claim in the sum of $1,302.11, and added a new creditor, Palisades Acquisition, with a claim in the sum of $3,767.61. Using these new figures, the Amount Financed totals $335,702.86. The difference between the Payoff Schedule prepared by Waite and the so-called final HUD-1 Settlement Statement is $1,102.25 ($335,702.86 - $334,600.61), excluding

---

[8] The Court cannot discern how this figure was calculated. The Payoff Statement from Homecomings, dated May 8, 2006, provides that the payoff on that date was $217,905.57. The statement referenced a per diem of $60.10, a late charge for a payment received after May 16th of $57.78, and a wire transfer fee of $20.

14

the $1,243.12 included in the Amount Financed in the Truth-in-Lending Statement.
Assuming the Total of Payments is correct, the Amount Financed on the Truth-in-Lending
Statement signed by the Debtor and submitted as an exhibit to Miller's Affidavit
($340,496.11) and an Amount Financed based on the so-called final HUD-1 Settlement
Statement can only be reconciled if the $1,243.12 item identified as "Loan Proceeds to:
Aloisi & Aloisi" is reduced by $1,102.25. In fact, when the $1,243.12 number appearing on
the Itemization of Amount Financed as "Loan Proceeds to : Aloisi & Aloisi" is reduced by
$1,102.25, the resulting figure is $140.87 - - the cash-back that the Debtor received after the
closing.[9]

With respect to the Truth-in-Lending Disclosure Statement and the Itemization of
Amount Financed, the Debtor, in his Verified Complaint, stated that "[t]he errors in the
amounts of payoffs and fees/charges significantly alter the amount financed , the pre-paid
finance charge, and the APR as disclosed in the Truth-in-Lending statement." The Debtor
also asserted that the APR was calculated improperly. Additionally, as noted above, he
claimed, without identifying any documents among those submitted by the Defendants,
that "his signatures and dates on various documents were forged."

Laudani indicated that after the closing he asked Miller's secretary to fax a copy of

---

[9] Reconciliation of the HUD-1 Settlement Statement, the Truth-in-Lending
Disclosure Statement and the Itemization of Amount Financed is not readily apparent.
It would be unlikely that the Debtor could perform the required computations without
a calculator and time to understand the ramifications of the increased payoff required to
close the loan, particularly as the $1,243.12 figure appearing on the Itemization of
Amount Financed is not identified as "Cash to Borrower," but rather loan proceeds
payable to Aloisi & Aloisi.

the HUD-1 Settlement Statement to him, which she did.  That statement, the first page of

which he alleged he initialed, set forth a cash distribution to borrower of $1,243.12,[10] rather

than the $140.87 appearing on the so-called final HUD-1 Settlement Statement attached to

Miller's Affidavit.  The Debtor complained that the copy provided to his bankruptcy

attorney by Tribeca has a first page without initials or signatures.  He also complained that

he did not receive copies of the closing documents for several weeks "after repeated

requests."  He stated that he received a check in the sum of $140.87 on May 9, 2006, but that

that sum was different than the one appearing on the HUD-1 faxed to him after the closing.

In his Verified Complaint, the Debtor also listed various payoffs which he was

unable to reconcile, emphasizing the following expenses which were part of the "Amount

Financed" calculated by Tribeca: a payment of $1,020 to a creditor identified as M.P.T.N.,

an appraisal fee of $275 paid to A.C. Klein, and a title insurance premium of $900 for which

he was overcharged $225.

In her Affidavit, Waite represented that after the three-day right of rescission had

expired, Aloisi & Aloisi issued a check to M.P.T.N. in the amount of $1,020.  She further

stated that "[o]n May 9, 2006, the MPTN [sic] check, along with Mr. Laudani's cash out

check, was mailed to him."  It is undisputed, however, that M.P.T.N. has never been paid.

Laudani stated that "so far as I know, it was never received." Laudani also indicated that

he picked up his check in the amount of $140.87 at the offices of Aloisi & Aloisi and cashed

---

[10] This is the same figure appearing on the Itemization of Amount Financed as
being payable to Aloisi & Aloisi.

16

it.

Waite  explained that Laudani was initially charged $900 for title insurance, listed on line 1101 of the HUD-1 Settlement Statement, although he should have been charged a lower "reissue rate" instead.  Thus, he was overcharged $225. With respect to the appraisal fee, she stated: "[t]o the best of my knowledge and belief, the lender, Tribeca paid the appraiser.  The Defendants did not produce a canceled check establishing payment for the appraisal.[11]

In addition to the documents discussed above, according to Miller, the Debtor also executed the following closing documents, which are attached to Miller's Affidavit: a Mortgage; a 1-4 Family Rider (Assignment of Rents); and an Adjustable Rate Note in the principal sum of $360,000, with an initial interest rate of 12.99%; an Adjustable Rate Rider; a Notice of Right to Cancel, which contains the attestation in capital letters that "Each of the undersigned hereby acknowledges the receipt of two (2) completed copies of this Notice of Right to Cancel;" a Uniform Residential Loan Application; a Continuation Sheet/Residential Loan Application; an ARM Program Disclosure; a Consumers' Guide to Obtaining a Home Mortgage; a Mortgage Rate Lock Commitment; and a Payment Letter to Borrower, setting forth a monthly payment amount, including insurance and taxes, of $4,559.96.  The Uniform Residential Loan Application set forth the following comparison of payments:

---

[11] Similarly, although the Debtor indicated that he paid a portion of an appraisal fee with a credit card, but he did not submit documentation supporting that assertion.

17

|  | Present | Proposed |
|---|---|---|
| First Mortgage (P & I) | 2,500.00 | 3,979.51 |
| Other Financing (P & I) | 1,700.00 | |
| Hazard Insurance | 146.42 | 146.42 |
| Real Estate Taxes | 434.04 | 434.04 |
| Total | 4,780.46 | 4,559.97 |

The Debtor could not afford the monthly mortgage payments to Homecomings and the Carpenter Trust, and he could not afford the mortgage payment to Tribeca. Although he noted the existence of a "Massachusetts Borrower's Interest Worksheet" with a date of May 3, 2006, which was never completed, he stated that his monthly income was about $1,517.[12] In addition to complaining that he did not receive a Borrower's Interest Worksheet, he disputed receipt of all required documents. He specifically stated that he "only received one copy of the Notice of Right to Cancel, not two." He also denied that the three-day right of rescission expired.

Laudani made no payments to Tribeca. He represented that he received a foreclosure notice from the Defendants in October of 2006. The Defendants scheduled a foreclosure sale for June 28, 2007. The Defendants rescheduled the sale for August 28, 2007. In his Verified Complaint, the Debtor represented that he sent a rescission letter to the Defendants on August 15, 2007. He filed his Chapter 13 bankruptcy petition approximately one week later.

---

[12] Neither party submitted a copy of a complete or incomplete Borrower's Interest Worksheet.

18

The Debtor, in his Supplemental Affirmation, stated that "[t]his whole transaction has been enormously stressful and upsetting," adding that "[w]orrying about whether I was going to lose my home to foreclosure makes me sick, both physically and emotionally." He also stated that the dosages of the prescription drugs which he takes had to be increased "by about 300%." His statements about his medical conditions were unsupported by affidavits from medical professionals or any other form of evidence.

## IV. DISCUSSION

A. Standard for Summary Judgment

As noted by this Court in In re Sullivan, 346 B.R. 4 (Bankr. D. Mass. 2006), the United States Court of Appeals for the First Circuit articulated the standard for summary judgment in Desmond v. Varrasso (In re Varrasso), 37 F.3d 760 (1st Cir.1994). The First Circuit stated:

> It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). As to issues on which the movant, at trial, would be obliged to carry the burden of proof, he initially must proffer materials of evidentiary or quasi-evidentiary quality-say, affidavits or depositions-that support his position. *See* Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1517 (1st Cir.1991); Bias v. Advantage Int'l, Inc., 905 F.2d 1558, 1560-61 (D.C.Cir.), *cert. denied*, 498 U.S. 958, 111 S.C[t]. 387, 112 L.Ed.2d 397 (1990); *cf.* Mendez v. Banco Popular de Puerto Rico, 900 F.2d 4, 7 (1st Cir.1990) ("The mere fact that plaintiff failed to file a timely opposition does not mean that defendant's Rule 56 motion should be granted"). When the summary judgment record is complete, all reasonable inferences from the facts must be drawn in the manner most favorable to the nonmovant. *See, e.g.,* Morris v. Government Dev. Bank, 27 F.3d 746, 748 (1st Cir.1994); Garside, 895 F.2d at 48; Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 934 (1st Cir.1987). This means, of course, that summary judgment is inappropriate if inferences are necessary for the judgment and those

inferences are not mandated by the record. *See* Blanchard v. Peerless Ins. Co., 958 F.2d 483, 488 (1st Cir.1992) (warning that summary judgment is precluded "unless no reasonable trier of fact could draw any other inference from the 'totality of the circumstances' revealed by the undisputed evidence").

Sullivan, 346 B.R. at 18 (quoting Desmond v. Varrasso, 37 F.3d at 763). In in a footnote, the First Circuit cautioned: "As to issues on which the nonmovant [the Debtor in this case] has the burden of proof, the movant need do no more than aver 'an absence of evidence to support the nonmoving party's case.' The burden of production then shifts to the nonmovant, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both 'genuine' and 'material.'" Desmond v. Varrasso, 37 F.3d at 763 n. 1. (citations omitted). In addition, the non-moving party "must set forth more than conclusory allegations, improbable inferences or unsupported speculation to establish genuine issues of material fact. Competent evidence is required." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Applying this standard, the Court, at the outset, rejects the Debtor's "belief" that various documents and the dates on them were forged. Such a bald assertion typifies the conclusory allegations rejected by the First Circuit in Medina-Munoz. The Debtor had copies of all documents attached to the Affidavits filed by Scanlon, Miller, and Waite for over two months. He failed to point to, or submit a copy of, a single document with a signature that he contended was forged. Because the Debtor failed to identify any forged documents, the Court is confronted with a conundrum: the Debtor's statements in his Verified Complaint and Affirmations are inconsistent with the documents produced by the

20

Defendants which he signed.  Stated another way, the Debtor represented that he did not

receive various documents and disclosures, but he signed documents sent to him by

Manhattan that indicated that he, in fact, received various documents and disclosures.

Because in ruling on a motion for summary judgment all reasonable inferences must be

resolved in the Debtor's favor, the Court shall *not* conclude, at this time, that the Debtor is

deliberately obfuscating the truth about what he knew and when he knew it.

     B. <u>Count II - Violations of Truth-in-Lending Act and Mass. Gen. Laws ch. 140D</u>

       1. Statue of Limitations

The Defendants seek summary judgment based upon the one-year statute of

limitations set forth in the federal Truth-in-Lending Act, ("TILA"), 15 U.S.C. § 1640(e),

because the Debtor filed his Verified Complaint on December 4, 2007, over one-year from

the May 3, 2006 closing.  Under TILA, actions for damages must be brought within one-

year of the occurrence of the violation, and actions for rescission must be brought within

three years.  *See* 15 U.S.C. §§ 1640(e) and 1635(f).  *See generally* <u>Beach v. Ocwen Fed. Bank</u>,

523 U.S. 410, 419 (1998). The Debtor, however, relies upon the four-year statute of

limitations applicable to the Massachusetts Consumer Credit Cost Disclosure Act

("MCCCDA"), Mass. Gen. Laws ch. 140D, §§ 1-35, TILA's state law counterpart,[13] for both

---

    [13] As noted by the court in <u>Cayre v. Long Beach Mortg. Co.</u>, 470 F.Supp.2d 3, 6
n.1 (D. Mass. 2007),

    The Federal Reserve Board has granted some exemptions to TILA in
    Connecticut, Maine, Massachusetts, Oklahoma, and Wyoming. 12 C.F.R.
    Pt. 226, Supp. I 12 C.F.R. § 226.29(a) ¶ 4. In these few states, as to certain
    TILA requirements, certain federal provisions have no force and creditors

damages and rescission.[14] *See* Mass. Gen. Laws. Ch. 140D, § 10 ("An obligor's right of

rescission shall expire four years after the date of consummation of the transaction or upon

the sale of the property, whichever occurs first, . . . ."); *see also* Mass. Gen. Laws Ch. 260, §

5A ("Actions arising on account of violations of any law intended for the protection of

consumers . . .  inclusive of chapter one hundred and forty D . . . whether for damages,

penalties or other relief and brought by any person . . . shall be commenced only within

four years next after the cause of action accrues."). Accordingly, the Defendants are not

entitled to summary judgment based upon TILA's one-year statute of limitations.

2. Material Disclosures

The Defendants also argue that the Debtor is barred from exercising his rescission

rights because he failed to do so within three business days of the May 3, 2006 closing,

citing both 15 U.S.C. § 1635(a) and Mass. Gen. Laws ch. 140D, § 10(a).[15]  The MCCCDA

are subject to state requirements that are generally similar to the federal
requirements. *See* Belini v. Washington Mut. Bank, FA, 412 F.3d 17, 20 (1st
Cir.2005) (citing Ives v. W.T. Grant Co., 522 F.2d 749, 755 (2d Cir.1975)).
According to the Federal Reserve Board's regulations, however, the
exemption's displacement of federal law in favor of state law is not
absolute. 12 C.F.R. § 226.29(b). It is well established that debtors retain at
least the ability to file suits for damages in federal court pursuant to 15
U.S.C. § 1640, regardless of the exemption. Belini, 412 F.3d at 20.

[14] The Debtor stated in his Verified Complaint that he "is entitled to rescission of
the mortgage loan, actual damages, statutory damages, court costs and attorney's fees."

[15] Regardless of whether the Debtor proceeds under state law, federal court
decisions under TILA "are instructive in construing the parallel provisions of the
CCCDA." Jaaskelainen v. Wells Fargo Bank, N.A. (In re Jaaskelainen), 391 B.R. 627, 640
(Bankr. D. Mass. 2008).

22

provides in relevant part:

> [T]he obligor shall have the right to rescind the transaction until midnight of
> the third business day following the consummation of the transaction or the
> delivery of the information and rescission forms required under this section
> together with a statement containing the material disclosures required by
> this chapter, whichever is later, by notifying the creditor, in accordance with
> regulations of the commissioner, of his intention to do so.

Mass. Gen. Laws ch. 140D, § 10(a).  While pointing out that the Debtor did not exercise his

rescission rights within three business days, the Defendants recognize that rescission rights

can be extended when the lender fails to provide certain material disclosures.  Material

disclosures mean:

> [T]he annual percentage rate, the method of determining the finance charge
> and the balance upon which a finance charge will be imposed, the amount
> of the finance charge, the amount to be financed, the total of payments, the
> number and amount of payments, and the due dates or periods of payments
> scheduled to repay the indebtedness.

Mass. Gen. Laws ch. 140D, § 1.  *See also* Id. at § 12; 15 U.S.C. § 1602(u); and 12 C.F.R.

226.23(a)(3) n. 48. The Defendants argue that they provided all material disclosures. Indeed,

they state the following:

> The Plaintiff alleges at ¶ 75 of his Verified Complaint, that the Itemization of
> Amount Financed included erroneous amounts for payoffs ($334,600.61) and
> "loan proceeds" for Aloisi & Aloisi ($1,243.12).  These figures are estimates
> of the amounts to be paid off and the corresponding amount that remained
> ("loan proceeds") after all the payoffs would be distributed to the settlement
> agent/borrower.  Shortly before Mr. Laudani's loan closed, however, it was
> determined that due to additional per diem charges on the two outstanding
> mortgages, the total payoff amount of the mortgages increased from
> $324,301.50 to $325,560.25 [$1,258.75].  As a result, the amount remaining for
> the settlement agent/borrower, decreased by a corresponding amount as

reflected on the final executed HUD-1 Settlement Statement.[16]

Despite payoff increases, the total amount financed as listed on the Itemization of Amount Financed did not change, nor did the prepaid finance charge. Both of these figures are correct and accurate.

The Court notes that both TILA and the MCCCDA permit the use of estimates but they must be labeled as such. *See* 15 U.S.C. § 1631(c); Mass. Gen. Laws ch. 140D, § 7(c); 209 Mass. Code Regs. 32.17 (b)(3)1. ("If any information necessary for accurate disclosure is unknown to the creditor, it shall make the disclosure based on the best information reasonably available and shall state clearly that the disclosure is an estimate."). The Itemization of Amount Financed executed by the Debtor at the closing on May 3, 2006, according to Waite, was based on estimates, but it was not labeled as such.

The Court finds that the Defendants successfully established how the so-called, final HUD-1 Settlement Statement, the Truth-in-Lending Disclosure Statement, and the Itemization of Amount Financed are reconcilable. The Debtor, however, maintains that multiple disclosures and problems with items set forth in the Amount Financed preclude summary judgment.

The Court finds, however, that there are genuine issues of material fact as to three

---

[16] Thus, the so-called excess loan proceeds of $1,243.12 decreased by $1,102.25, leaving $140.87. Stated another way, the increased mortgage payoffs of $1,258.75 were offset by a $156.50 decrease in payments to M.P.T.N., NCO Financial, and others ($1,258.75 - $156.50 = $1,102.25). Accordingly, the Amount Financed could remain the same on the Truth-in-Lending Disclosure Statement.

items that are part of the Amount Financed,[17] namely the $275 appraisal fee; the $900 cost

of title insurance which was overstated in the amount of $225; and the non-payment of

$1,020 to M.P.T.N.  Neither the Debtor nor the Defendants established who paid the $275

appraisal fee to A.C. Klein and because all inferences must be drawn in the Debtor's favor,

the Court is compelled to conclude that a genuine issue of material fact exists as to that

component of the Amount Financed.

Similarly, a genuine issue of material fact exists as to the M.P.T.N. obligation.  The

Defendants submitted no admissible evidence as to why Waite mailed a check payable to

M.P.T.N. to the Debtor instead of the creditor.  Additionally they did not offer evidence as

to why Tribeca did not amend its disclosures to account for the non-payment.

---

[17] Section 12 of chapter 140D provides:

For the purposes of this subclause, "itemization of the amount financed"
means a disclosure of the following items, to the extent applicable:

(i) the amount that is or shall be paid directly to the
consumer;

(ii) the amount that is or shall be credited to the consumer's
account to discharge obligation owed to the creditor;

(iii) each amount that is or shall be paid to third persons by
the creditor on the consumer's behalf, together with an
identification of or reference to the third person; and

(iv) the total amount of any charges described in subclause
(iii) of clause (A) of paragraph (2).

Mass. Gen. Laws ch. 140D, § 12(a)(2)(B)

25

Finally, the Amount Financed included $225 in excess of what should have been included for title insurance. Although the Defendants discovered the error and remitted the amount of the overpayment to the Debtor in the amount of $225.30, they did so in October of 2007, long after the closing.  Thus, a genuine issue of material fact exists as to whether the inclusion of the overpayment, in conjunction with the other two items made part of the Amount Financed, resulted in a materially inaccurate Truth-in-Lending Disclosure Statement.

The Court notes that, although the Debtor has asserted that the Defendants misrepresented the Finance Charge and the Annual Percentage Rate, any error in those disclosures must stem from errors in the Amount Financed, as the Debtor did not dispute any specific items improperly included in the Finance Charge in response to the Defendants' submissions.  Because the Amount Financed is the difference between the total of prepaid finance charges, namely $19,503.89 and the loan amount of $360,000, and because the Debtor did not challenge a single component of the $19,503,89 in prepaid finance charges in his pleadings filed after the Defendants' Motion for Summary Judgment or at oral argument on the Motion for Partial Summary Judgment, the relevance of the problems noted by the Debtor with respect to the Amount Financed may not give rise to a claim for rescission.  Nevertheless, in view of the questions about the appraisal fee, the payment to M.P.N.T, and the excess fee initially charged for title insurance, the Court concludes that genuine issues of material fact exist as to the accuracy of the Amount Financed, and, accordingly, the Debtor's receipt of the material disclosures required by

Mass. Gen. Laws ch. 140D, §§ 1 and 12.  Stated another way, the parties at trial on Count

II must address issues surrounding the three charges identified above and the ramifications

of errors, if any, that result  *See* Mass. Gen. Laws ch. 140D, §§ 10(a), 32(a). *See also* Mass.

Gen. Laws ch. 140D, § 4(f); 209 Code Mass. Regs. § 32.18(d); and <u>Mayo v. Key Fin. Servs.,</u>

<u>Inc.,</u> 424 Mass. 862, 864 (1997).

<div align="center">3. Timeliness of Disclosures</div>

The Debtor also represented in his Verified Complaint that he did not receive the

required disclosures in a timely manner, including, but not limited to, "the identity of the

lender, and the Adjustable Rate Mortgage Program disclosure."  The Debtor further stated

that he never received a loan application from Tribeca until the day of the closing.  The

Defendants, however, maintain that the TILA disclosures did not have to be made until the

time of consummation of the loan on May 3, 2006.

Section 12 of Mass. Gen Laws ch. 140D, provides in relevant part the following:

> Except as otherwise provided in this chapter, the disclosures required under subsection (a) shall be made before the credit is extended. . . .

> In the case of a residential mortgage transaction, as defined in section one, which is also subject to the Real Estate Settlement Procedures Act 12 U.S.C. 2601 et seq, *good faith estimates of the disclosures required under subsection (a) shall be made in accordance with regulations of the commissioner under subsection (c) of section seven before the credit is extended, or shall be delivered or placed in the mail not later than three business days after the creditor receives the consumer's written application, whichever is earlier.* If the disclosure statement furnished within three days of the written application contains an annual percentage rate which is subsequently rendered inaccurate within the meaning of subsection (c) of section five, the creditor shall furnish another statement at the time of settlement or consummation.

Mass. Gen. Laws ch. 140D, § 12(b)(1) and (2)(emphasis supplied).  In view of the foregoing

<div align="center">27</div>

provisions, and the Debtor's representation in his Verified Complaint that he "never filled out any application before the closing," the Court finds that the Debtor is estopped from arguing that he was entitled to a good faith estimate prior to the closing. The Debtor cannot have it both ways.  If he completed an application prior to the closing, he was entitled to have a good faith estimate mailed to him not later than three business after receipt of the written application.  Because Laudani indicated that he did not execute an application, Tribeca was entitled to provide it before the credit was extended at the closing.

With respect to the identity of the lender, the Court again notes inconsistencies in the Debtor's pleadings.  Although Laudani in his Affirmation asserted he was unaware of the identity of the lender until the date of the closing, in his Verified Complaint he asserted that he learned the identity of the lender in late April when he received his insurance binder. Additionally, before the closing, he signed the Affidavit and Acknowledgment from Borrower which identified Tribeca as the lender.

### 4. Multiple HUD-1 Settlement Statements

The Debtor asserted that he signed multiple copies of disclosure documents and that the Truth-in-Lending Disclosure Statement overstated the Amount Financed by $5,458.37. Because of that assertion, he rejected Defendants' reliance upon one *final* HUD-1 Settlement Statement.  The Debtor argued that he was confused because there were several drafts of the HUD-1 Settlement Statement.  Because the Defendants submitted a HUD-1 Settlement Statement with the Debtor's signature, and the Debtor did not contest his signature on that document, the Court finds that regardless of whether there were multiple versions of the

28

HUD-1 Settlement Statement, the Debtor failed to rebut the Defendants' evidence of a final statement. Accordingly, the HUD-1 Settlement Statement, identified by Miller and Waite as the *final* HUD-1 Settlement Statement is the operative document. Moreover, Laudani failed to produce copies of the HUD-1 Settlement Statements that he referenced in his Verified Complaint, including the HUD-1 Settlement Statement that he stated was faxed to him immediately after the closing. Nevertheless, in a case cited by the Defendants, Pulphus v. Sullivan, No. 02 C 5794, 2003 WL 1964333 (N.D. Ill. April 28, 2003), the court stated: "Because plaintiff has alleged that she received two contradictory disclosure statements simultaneously, not successively, Citizens can take no refuge in the regulation governing the correction of early disclosures." Id. at *13 (citing Vance v. National Benefit Ass'n, No. 99 C 2627, 1999 WL 731764, at *3 (N.D. Ill. Aug. 30, 1999) (stating, in a loan splitting case involving a credit card charge combined with a retail installment contract, that "'[the] giving of two separate disclosure statements for a single loan transaction is a violation of TILA's requirement of a single, comprehensible disclosure of the cost of credit.") (internal quotation marks and citation omitted)). Although the loan transaction described by the Debtor in his Verified Complaint does not involve loan splitting, the Court finds that even though there was a final HUD-1 Settlement Statement there is an issue of material fact as to whether the Debtor simultaneously was given and signed disclosure forms that were materially inconsistent.

    5. Variable Interest Rate Disclosure

    Massachusetts regulations require multiple disclosures with respect to adjustable

29

rate mortgages.  For mortgage loan transactions subject to the Real Estate Settlement

Procedures Act ("RESPA"), 12 U.S.C. §§ 2602-2617, the following regulation applies:

> If the annual percentage rate may increase after consummation in a
> transaction secured by the consumer's principal dwelling with a term greater
> than one year, the following disclosures must be provided *at the time an*
> *application form is provided or before the consumer pays a non-refundable fee,*
> *whichever is earlier:*
>
>> (a) The booklet titled Consumer Handbook on Adjustable Rate
>> Mortgages published by the Board and the Federal Home Loan
>> Bank Board, or a suitable substitute.
>>
>> (b) A loan program disclosure for each variable-rate program
>> in which the consumer expresses an interest. The following
>> disclosures, as applicable, shall be provided:
>>
>>> 1. The fact that the interest rate, payment, or
>>> term of the loan can change.
>>> 2. The index or formula used in making
>>> adjustments, and a source of information about
>>> the index or formula.
>>> 3. An explanation of how the interest rate and payment
>>> will be determined, including an explanation of how the
>>> index is adjusted, such as by the addition of a margin.
>>> 4. A statement that the consumer should ask
>>> about the current margin value and current
>>> interest rate.
>>> 5. The fact that the interest rate will be discounted, and
>>> a statement that the consumer should ask about the
>>> amount of the interest rate discount.

209 Mass. Code Regs. 32.19 (emphasis supplied) (footnotes omitted).  "Disclosures may be

delivered or placed in the mail not later than three business days following receipt of a

consumer's application when the application reaches the creditor by telephone, or through

an intermediary agent or broker."  Id. at note 45b.  *See also* 12 C.F.R. § 226.18(f)(2)(" If the

annual percentage rate may increase after consummation in a transaction secured by the

consumer's principal dwelling with a term greater than one year, the following disclosures [must be made]: (i) The fact that the transaction contains a variable-rate feature. . . [and] . . . (ii) A statement that variable-rate disclosures have been provided earlier.").

As noted above, material disclosures are defined as "the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness, and the disclosures required by section 1639(a)." Mass. Gen. Laws ch. 140D, §§ 1 and 12; 15 U.S.C. § 1602(u).[18]   The list does not specifically include the variable rate disclosures set forth in the state and federal regulations.   Thus, the Defendants argue that "only a failure to disclose the very existence of the variable rate constitutes a "material" non-disclosure which would extend the right of rescission.   They cite, *inter alia*, Pulphus v. Sullivan, No. 02 C 5794, 2003 WL 1964333 (N.D. Ill. April 28, 2003).   In that case, the court determined the following:

> The plain meaning of the [Federal Reserve] Board's commentary on 12 C.F.R. § 226.23(a)(3) is that only one variable rate disclosure violation-a lender's failure to disclose the existence of a variable rate feature-tolls the rescission period. A lender's failure to provide any of the other variable rate disclosures required by 12 C.F.R. §§ 226.18(f) and 226.19(b) may subject it to other sanctions, but it will not extend the rescission period granted to the consumer. According to the Supreme Court, "deference [to the Board] is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, [the Board's] staff opinions construing the Act or Regulation should be dispositive." Ford

---

[18] Section 1639 sets forth the additional disclosures that are required if the loan is a high cost loan.

31

Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980). There is nothing irrational about the Board's desire to extend the period to rescind a loan, a rather Draconian remedy, only for those consumers who were completely unaware that their loan had a variable rate. Accordingly, we will adhere to the plain language of its interpretation and hold that *the only variable rate disclosure that is material within the meaning of 12 C.F.R. § 226.223(a)(3) is the disclosure that a loan has a variable interest rate feature.* Vanzant [the plaintiff] was told her second loan had a variable rate feature, and she does not allege any other basis for extending the rescission period. Therefore, her claim to rescind the second loan, which was filed nearly seventeen months after the transaction was consummated, is untimely. *See generally* Resolution Trust Corp. v. Martinez, No. C-3-93-429, 1994 WL 1631035 (S.D. Ohio Aug. 24, 1994) (deferring to Board's interpretation of 12 C.F.R. § 226.23(a)(3) and holding that lender is only required to disclose existence of variable rate feature to avoid extending rescission period).

2003 WL 1964333 at *14 (emphasis supplied).

Laudani signed an "ARM Program Disclosure" and a "Consumers' Guide to Obtaining a Home Mortgage" at the closing. Thus, the Defendants provided him with disclosure of the *existence* of a variable interest rate, although they did not establish that they made the other disclosures required by 209 Mass. Code Regs. 32.19. The Debtor cited no case or regulation to support his position that he is entitled to rescind the mortgage based upon a failure to provide those additional variable rate disclosures.

In view of the foregoing, the Court concludes that the Defendants are not entitled to summary judgment on Count II of the Debtor's Complaint with respect to the material disclosures required under MCCCDA as discussed in section B.2 and B.4 above. Trial shall be limited to issues discussed in those sections. Defendants' Motion shall be granted with respect to the timeliness of disclosures and the variable interest rate disclosure.

C. Count IX - Violation of HOEPA and Mass. Gen. Laws ch. 183C

Laudani alleged in his Verified Complaint that "[t]he actual APR, not the scheduled APR exceeds comparable treasury security yield by more than 8%."   Additionally, he stated:

> The defendants violated 15 U.S.C. § 1639 and M.G.L. Ch. 183C by failing to make various disclosures required under this section, by misrepresenting material information on the transaction, by failing to disclose in a timely manner, and by extending credit without regard to payment ability of Laudani.  No income information was ever taken by defendants.

In response, the Defendants, in their Memorandum in Support of their Motion for Partial Summary Judgment, argue that the loan made to Laudani was not a high cost loan subject to the requirements of either the Home Owners Equity Protection Act ("HOEPA"), 15 U.S.C.  § 1639, or the Massachusetts Predatory Home Loan Practices Act, Mass. Gen. Laws ch. 183C, § 1 *et seq.*

As noted by the court in Morrison v. Brookstone Mortg. Co., Inc., 415 F.Supp.2d 801 (S.D. Ohio 2005), "HOEPA is an amendment to the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* The law requires that certain disclosures be made, including certain terms and admonitions regarding a "high cost mortgage." 415 F.Supp.2d at 807.  Section 1602(aa) of TILA contains a two-part test for determining whether a mortgage loan is governed by HOEPA, namely an "APR" test and a "points and fees" test.  It provides:

> A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if–
>
> (A) the annual percentage rate at consummation of the

33

> transaction will exceed by more than 10 percentage points the
> yield on Treasury securities having comparable periods of
> maturity on the fifteenth day of the month immediately
> preceding the month in which the application for the extension
> of credit is received by the creditor; or
>
> (B) the total points and fees exceed the greater of 8 % of the
> total loan amount or $400.00.

15 U.S.C. § 1602(aa)(1)(A) and (B). *See also* 12 C.F.R. § 226.32 (providing coverage when

"[t]he annual percentage rate at consummation will exceed by more than 8 percentage

points for first-lien loans, or by more than 10 percentage points for subordinate-lien loans,

the yield on Treasury securities having comparable periods of maturity to the loan

maturity as of the fifteenth day of the month immediately preceding the month in which

the application for the extension of credit is received by the creditor").  Points and fees are

defined by the statute to include

> (A) all items included in the finance charge, except interest or the time-price
> differential;
> (B) all compensation paid to mortgage brokers;
> (C) each of the charges listed in section 1605(e) of this title (except an escrow
> for future payment of taxes), unless-
>
>> (i) the charge is reasonable;
>> (ii) the creditor receives no direct or indirect compensation;
>> and
>> (iii) the charge is paid to a third party unaffiliated with the
>> creditor; and
>
> (D) such other charges as the Board determines to be appropriate.

§ 1602(aa)(4). Required disclosures for a high cost mortgage must be made not less than

three business days prior to the transaction's consummation. 15 U.S.C. § 1639(b)(1).  As the

court stated in <u>Vincent v. Ameriquest Mtg. Co. (In re Vincent)</u>, 381 B.R. 564 (Bankr. D.

Mass. 2008), for those borrowers whose loans are governed by HOEPA, "the creditor has an obligation to not extend credit 'based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations and employment.'" 381 B.R. at 570 (citing 15 U.S.C. § 1639(h)).

The Defendants, relying upon the Truth-in-Lending Disclosure Statement and Itemization of Amount Financed, apply the APR test based upon what they described as "a preliminary loan application to Tribeca made by Walsh on February 23, 2006." They maintain that the relevant date for comparable securities is thus January 15, 2006 when, according to the Federal Reserve Board Statistical Release H-15, the yield on 20 year treasury bonds, which at the time was the closest maturity to a 30-year mortgage, was 4.59%. Adding 8% to that figure yields an APR of 12.59%, compared with the 12.419% set forth in the Truth-in-Lending Disclosure Statement.

The Debtor did not respond to the Defendants' computation. Although genuine issues of material fact exist as to three elements of the Amount Financed and the Debtor's purported receipt of multiple disclosures, the Court finds that the burden shifted to the Debtor to come forward with a credible scenario which would cause the loan to fail the APR test. Silence in the face of the Defendants' submission is insufficient. The Debtor referenced multiple HUD-1 Settlement Statements and Truth-in Lending Disclosure Statements in his Verified Complaint. Although he stated that the Amount Financed was overstated by $5,458.37 and the actual APR was 12.6476%, he subsequently failed to address the computations set forth in the Defendants' Motion for Partial Summary

35

Judgment.  At oral argument, his counsel limited his objections to the items discussed above in  the Amount Financed.

The Defendants also applied the HOEPA points and fees test, relying upon 12 C.F.R. § 226.32(b)(1).  Starting with the prepaid finance charge of $19,503.89, the Defendants deducted the prepaid interest charge of $3,074.89, the credit report charge of $11.50, and the flood certificate charge of $13.50, resulting in a total of $16,404 for points and fees or, in the words of the Defendants, "just 4.81% of the Amount Financed, $340,496.11."  Because the points and fees do not approach the 8% trigger, the Defendants stated the loan is not a HOEPA loan.

As with the APR test, the Debtor did not mention, let alone address, the total points and fees test set forth in 15 U.S.C. § 1602(aa).  The Defendants filed their Motion for Partial Summary Judgment on August 19, 2008.  The Debtor filed his Objection over eight weeks later.  Because the Debtor failed to produce a scintilla of evidence that would permit this Court to find that the May 3, 2006 loan was a HOEPA loan, other than bald assertions that the APR was calculated improperly, the Court rejects the Debtor's position that the loan is governed by the provisions of HOEPA.

The Debtor also purported to state a claim under Mass. Gen. Laws ch. 183C, the Massachusetts Predatory Home Loan Practices Act.  That Act proscribes high cost home mortgage loans which meet the following conditions:

> i) the annual percentage rate at consummation will exceed by more than 8 percentage points for first-lien loans, or by more than 9 percentage points for subordinate-lien loans, the yield on United States Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day

36

of the month immediately preceding the month in which the application for the extension of credit is received by the lender; and when calculating the annual percentage rate for adjustable rate loans, the lender shall use the interest rate that would be effective once the introductory rate has expired.

(ii) Excluding either a conventional prepayment penalty or up to 2 bona fide discount points, the total points and fees exceed the greater of 5 per cent of the total loan amount or $400; the $400 figure shall be adjusted annually by the commissioner of banks on January 1 by the annual percentage change in the Consumer Price Index.

Mass. Gen. Laws ch. 183C, § 2.  As is clear from the language of the Act, it mirrors HOEPA. For the same reasons set forth above, the Court finds that the Debtor failed to meet his burden of demonstrating an issue of material fact as to the applicability of the Massachusetts Predatory Home Loan Practices Act to the loan transaction with Tribeca. Thus, the Defendants are entitled to summary judgment on Count IX.[19]

### D. Count VIII-Unconscionability

The Defendants argue that the Debtor cannot establish either procedural or substantive unconscionability in the loan transaction.  They point to Laudani's position as a Senior Loan Officer with Mortgage Pros USA and his request for a no income, no asset verification loan.  They also argue that the loan was not negatively amortized and did not

---

[19] Although the Defendants' loan may not be proscribed by the Massachusetts Predatory Home Loan Practices Act, it nevertheless may violate Mass. Gen. Laws ch. 93A.  *See* Commonwealth of Massachusetts v. Fremont Investment and Loan, 452 Mass. 733, *8, 897 N.E.2d 548, 560 ( 2008)("the judge appropriately could and did 'look to Chapter 183C as an established, statutory expression of public policy that it is unfair for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure.'").

contain a balloon payment feature.  The Debtor, in a one sentence response in which he referred to the impending foreclosure sale which ostensibly deprived him of any choice but to close the loan with Tribeca, merely stated that "[t]hese same facts support Laudani's claim that the transaction was substantively and procedurally unconscionable."

This Court addressed the applicable law with respect to a claim for unconscionability in Maxwell v. Fairbanks Capital Corp. (In re Maxwell), 281 B.R. 101 (Bankr. D. Mass. 2002).  Quoting the decision of the district court in United Companies Lending Corp. v. Sargeant, 20 F.Supp.2d 192 (D. Mass.1998), this Court stated:

> Unconscionability is a question of law to be assessed at the time the contract was executed by the parties. See Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291, 408 N.E.2d 1370 (1980). It is a case-specific assessment. "Because there is no clear, all-purpose definition of 'unconscionable,' nor could there be, unconscionability must be determined on a case by case basis, giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party." Id. 381 Mass. at 292-93, 408 N.E.2d 1370 (internal citations omitted). . . .
>
> The principle of unconscionability is addressed in the Uniform Commercial Code, see U.C.C. § 2-302, and the Supreme Judicial Court has applied the principles of unconscionability articulated there to "situations outside the ambit of the code." Waters v. Min Ltd., 412 Mass. 64, 67, 587 N.E.2d 231 (1992). Under Massachusetts law, the doctrine of unconscionability recognizes procedural and substantive unconscionability. See Zapatha, 381 Mass. at 292-93, 294 n. 13, 408 N.E.2d 1370. Procedural unconscionability evaluates the circumstances under which the contract was executed to determine if it is the product of unfair surprise. Substantive unconscionability evaluates the actual terms of the contract to determine if they are substantively unfair. "If the sum total of the provisions of a contract drive too hard a bargain, a court of conscience will not assist its enforcement." Waters, 412 Mass. at 68, 587 N.E.2d 231 (citing Campbell Soup Co. v. Wentz, 172 F.2d 80, 84 [3d Cir.1948] ). . . .

* * * * * *

38

The fact that this conduct constitutes an unfair or deceptive practice, however, does not mean that this conduct was unconscionable.

Maxwell, 281 B.R. at 128-29 (quoting Sargeant, 20 F.Supp.2d at 206-07). In In re Sullivan, 346 B.R. 4, 26 (Bankr. D. Mass. 2006), this Court recognized that "'[t]he test [for unconscionability] is a conjunctive one; that is, a plaintiff must prove both substantive and procedural unconscionability to prevail on this theory.'" 346 B.R. at 26 (citing Storie v. Household Intern., Inc., No. 03-40268-FDS, 2005 WL 3728718 at *9 (D. Mass. Sept. 22, 2005) and Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 293 (1980) ("This two-part test for unconscionability involves determining whether there was an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party.")).

Viewing the facts in the light most favorable to the Debtor, the Court accepts the Debtor's assertion that he did not receive disclosures until the closing. Because the Debtor failed to produce evidence to rebut that produced by the Defendants with respect to the applicability of HOEPA and Mass. Gen. Laws ch. 183C, the Court finds that the Defendants were not required to make disclosures prior to the closing except for the variable interest rate. Accordingly, the absence of disclosures prior to the closing does not alone make the loan unconscionable .

The Debtor also asserts that there were multiple HUD-1 Settlement Statements that showed, in different versions, that he was entitled to $1,271.12 in cash, $1,243.12 in cash, and $140.87 in cash, which is the sum that he received following the closing. He also states that he was shocked to learn, *inter alia*, that he would only be receiving $140.87, that the

39

APR was below the contractual interest rate, and that he was asked to sign two sets of HUD-1 Settlement Statements and two sets of Truth-in-Lending Disclosure Statements. The Court finds that, while the disparity in those sums, as well as the potential problems with the amounts set forth in the Amount Financed, possibly could result in damages or even rescission under the MCCCDA, the Debtor failed to point to specific facts that would permit this Court to determine that the mortgage loan was *both* procedurally or substantively unconscionable.  In particular, the Debtor failed to establish that there was "gross disparity in the values exchanged" such that he gained no advantage from the transaction.   The Debtor, who was employed at Mortgage Pros, stated in his Affirmation that he was not a sophisticated borrower.  Although the Court finds that the Debtor's deposition testimony in which he demonstrated some knowledge of the lending industry, in particular, familiarity with the terms such as "hard money lender" and "NINA," seemingly contradicts his Affirmation that he was not a sophisticated borrower,[20] assuming he were as unsophisticated as he maintains, his status as such a borrower, without more, does not make him a victim of unconscionable actions taken by the Defendants.  His circumstances at the time of the May 3, 2006 closing were far different than those of the borrowers in Maxwell and Sargeant.  The Debtor was aware that he was not a candidate for a conventional mortgage.  He had refinanced his home several times, he was a landlord, he had borrowed money from a "hard money" lender secured by a second mortgage to

---

[20] At his deposition, the Debtor testified, "I was limited in the number of lenders that would lend to me, but they were going to lend cash out to me.  With this type of program, cash out was a possibility."

40

obtain cash to refurbish his Property, cash which he used for an internet start-up company instead, he was facing foreclosure, and he was behind in his revolving credit card payments.  He specifically requested a loan through a mortgage broker with whom he had dealt in the past - - a loan that did not require verification of his income, assets or employment. Even if the Debtor were surprised that he was unable to obtain more cash from his refinancing with Tribeca than he ultimately received, that surprise is not the equivalent of the *unfair* surprise component needed to establish procedural unconscionability.  This is particularly so in view of the Debtor's dealings with the Carpenter Trust when he learned that he would receive much less money than he originally anticipated.  Moreover, the Debtor cannot credibly argue that he received no benefit from the transaction, which satisfied two mortgages and several liens against the Property and resulted in cancellation of an impending foreclosure sale.  Accordingly, the Court shall enter an order granting summary judgment to the Defendants on Count VIII.

E. Count IV -Borrower's Interest

In his Verified Complaint, the Debtor alleged that the refinancing was not in his interest because his monthly payments increased.  He also alleged that the Defendants failed to conduct the analysis required by the statute prior to making the loan and that a copy of the Massachusetts Borrower Interest Worksheet provided by Tribeca was blank.

The Defendants maintain that they are entitled to summary judgment on Count IV because the Debtor is both factually and legally incorrect.  They add that the Debtor's reliance on the blank Borrower's Interest Worksheet is misplaced, stating the following:

41

> While the statute and regulations require a lender to determine whether the
> loan is in the borrower's best interest, they do not require that the lender
> provide to the borrower any documentation of this analysis. Even if the
> statute requires the lender to complete the worksheet, the failure to do so
> does not harm the borrower in a case like this were [sic] the statutory factors
> make clear that the loan was in the borrower's best interest.

The Debtor's only response to this argument was that his payments increased and that "the

defendants cannot escape that fact by saying they are not required to give Laudani a copy

of their calculations."

> Pursuant to Mass. Gen. Laws ch. 183, § 28C,

> (a) A lender shall not knowingly make a home loan if the home loan pays off
> all or part of an existing home loan that was consummated within the prior
> 60 months or other debt of the borrower, unless the refinancing is in the
> borrower's interest. The "borrower's interest" standard shall be narrowly
> construed, and the burden is upon the lender to determine and to
> demonstrate that the refinancing is in the borrower's interest.

> Factors to be considered in determining if the refinancing is in the borrower's
> interest include but are not limited to:--

> > (1) the borrower's new monthly payment is lower than the
> > total of all monthly obligations being financed, taking into
> > account the costs and fees;
> > (2) there is a change in the amortization period of the new loan;
> > (3) the borrower receives cash in excess of the costs and fees of
> > refinancing;
> > (4) the borrower's note rate of interest is reduced;
> > (5) there is a change from an adjustable to a fixed rate loan,
> > taking into account costs and fees; or
> > (6) the refinancing is necessary to respond to a bona fide
> > personal need or an order of a court of competent jurisdiction.

Mass. Gen. Laws ch. 183, § 28C.  *See also* 209 Code Mass. Regs 53.04(3).[21]   A lender is

---

[21] The Regulation sets forth the following factors:
(a) the borrower's new monthly payment is lower than the total of all

required to determine the borrower's interest not later than the closing.  209 Code Mass.

Regs. 53.06.  The statute further provides:

> [I]f a home loan does not meet one of the factors in 209 CMR 53.04(1) [sic], a
> lender shall indicate specifically how the lender determined that the home
> loan was in the borrower's interest . . . [and] . . . [a] lender may request that
> a borrower acknowledge receipt of such a worksheet or other
> documentation; provided, however, a lender shall not shift the burden to the
> borrower to demonstrate that a home loan is in the borrower's interest; and
> provided further that a lender shall not require a borrower to sign a waiver
> of future claims under M.G.L. c. 183, § 28C or 209 CMR 53.00 [sic].

209 Code Mass. Regs. 53.07.  The Borrower's Interest Statute does not specifically set forth

a remedy for violation of its provisions.  Nevertheless, by implication, a borrower may be

entitled to costs and attorney's fees as subsection (b) provides:

> Notwithstanding any provision to the contrary contained in this chapter
> regarding costs and attorneys' fees, in any action instituted by a borrower
> who alleges that the defendant violated subsection (a), the borrower shall not
> be entitled to costs and attorneys' fees if the presiding judge, in the judge's
> discretion, finds that, before the institution of the action by the borrower, the
> lender made a reasonable offer to cure and that offer was rejected by the
> borrower.

---

monthly obligations being financed, taking into account the costs and fees;
(b) there is a change in the amortization period of the new loan compared
to the original amortization term of the old home loan;
(c) the borrower receives cash in excess of the costs and fees of refinancing;
(d) the borrower's note rate of interest is reduced;
(e) there is a change from an adjustable to a fixed rate loan, taking into
account costs and fees;
(f) the refinancing is necessary to respond to a bona fide personal need or
an order of a court of competent jurisdiction; or
(g) the time it takes to recoup the costs of refinancing, taking into account
the costs and fees.
209 Mass. Code Regs. 53.04.

43

Mass. Gen. Laws ch. 183, § 28C(b).

The Debtor represented in his Verified Complaint that "[t]he total monthly payment for both Homecomings and Carpenter Trust was about $4,200." In his Memorandum, the Debtor represented that "the payments to his previous mortgagees totaled around $4,200, *including taxes and insurance.*" That statement is inconsistent with the allegation in his Verified Complaint and the Loan Application produced by the Defendants which he signed at the closing. The statement in the Memorandum cannot create a genuine issue of material fact without the submission of documentary evidence to rebut what was set forth in the Loan Application. The "Payment Letter to Borrower," which the Debtor also signed at the closing, reveals that the monthly payment for principal and interest was $3,979.50. The Defendants, through the Loan Application signed by the Debtor at the closing, submitted evidence that the total monthly payments to Homecomings and the Carpenter Trust was $4,780.46, including insurance and taxes, while the monthly payment on the Tribeca loan, including insurance and real estate taxes, was $4,559.96. Thus, the Debtor's monthly payment decreased.

Applying the factors set forth in the statute and regulations, the Court finds that the Debtor failed to rebut the Defendants' assertion that the refinancing was in his best interest. The Debtor's loan transaction with Tribeca resulted in the payoff and consolidation of two mortgages, one from Homecomings and one from the Carpenter Trust. His loan payment was reduced by approximately $220; the interest rate was lower than the 18% interest rate applicable to the Carpenter Trust loan; and the refinancing was necessary to respond to "a

44

bona fide personal need," namely the avoidance of an imminent foreclosure sale. Additionally, the Debtor received some cash from the transaction.

In response to the Defendants' Motion for Summary Judgment, as noted above, the Debtor erroneously represented that his mortgage payments prior to the May 3, 2006 refinancing were $4,200, including insurance and taxes. The Court finds that his argument is woefully insufficient to rebut the Defendants' submissions and to establish the existence of a genuine issue of material fact.  Not only did the Debtor fail to apply the factors set forth in the statute, he also failed to articulate how he was damaged by any failure of the Defendants to provide him with, or keep a copy of, the Borrower's Interest Worksheet.  His remaining arguments were conclusory and devoid of any evidence as to causation and damage resulting from any violation of the statute.   Accordingly, the Court shall enter an order granting summary judgment in favor of the Defendants on Count IV.

F. Count VII- Breach of Contract

In Count VII of his Verified Complaint, the Debtor alleged that he was induced to enter into the loan transaction with Tribeca; that the actions of the Defendants were intended to deprive him of his home and the equity in it for their own pecuniary gain; that the Defendants knew or should have known that he "did not have the ability to repay the amount lent without a rental income dependent on the renovation of his house to be funded by a significant cash out from the loan;" that the Defendants failed to perform certain terms of the loan by failing to pay "various fees/charges" on the HUD-1 Settlement Statement or overstating amounts they paid, and by failing to "distribute the amount of

45

cash to Laudani as he was induced to believe before the closing and as was reflected in two

of the three HUD-1 statements;" that because the value of the Property was in excess of the

loan amounts, the Defendants knew they could foreclose and "make a profit unjustly,

unfairly and inequitably." He further asserted that the Defendants violated the covenant

of good faith and fair dealing which is part of every contract.

The Defendants maintain that Count VII consists largely of allegations already

addressed in other counts of Laudani's Complaint. They assert that they established

through Waite's affidavit, to which canceled checks were attached, that with the exception

of M.P.T.N., they accurately listed payoff amounts and paid all amounts they were

required to pay. They also assert that there was no breach of contract with respect to the

amount of the cash-out Laudani expected to receive because, even if true, the crux of that

allegation is fraud, not breach of contract. Citing Liss v. Studney, 450 Mass. 473, 477 (2008),

they argue that the Debtor did not allege that they exerted undue leverage or acted to

deprive him of his "right . . . to receive the fruits of the contract." Moreover, they argue

that the Debtor failed to establish that they violated the Borrower's Interest Statute, Mass.

Gen. Laws ch. 183, § 28C. They conclude:

> Even if the loan were not in Laudani's best interest, however, defendants'
> conduct in making the loan does not breach the common law duty of good
> faith and fair dealing. As the Supreme Judicial Court pointed out in Liss,
> "[t]he covenant may not . . . be invoked to create rights and duties not
> otherwise provided for in the existing contractual relationship. . . . The scope
> of the covenant is only as broad as the contract that governs the particular
> relationship." Yet, that is exactly what Laudani is attempting to do. The loan
> contract imposed no duty on defendants to make a loan Laudani could not
> repay.

The Defendants also reject any notion that a common law duty exists for a lender to make a loan that the borrower can repay.

> In <u>Liss</u>, the Supreme Judicial Court stated:

> Every contract is subject to an implied covenant of good faith and fair dealing. The purpose of the covenant "is to guarantee that the parties remain faithful to the intended and agreed expectations" of the contract, and to ensure that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." The covenant "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." "The scope of the covenant is only as broad as the contract that governs the particular relationship."

450 Mass. at 477 (citations omitted).

The Debtor's allegations under Count VII are largely duplicative of those contained in Counts II and V and X.  The Court rejects the Debtor's contention that the Defendants breached the implied covenant of good faith and fair dealing simply by making the loan to him.  The Court finds, however, that there is an issue of fact with respect to payment of M.P.T.N., presumably a creditor with a lien or execution against the Property.  The Debtor failed to allege how he was damaged by the failure to pay M.P.T.N., whose lien would have priority over the mortgage lien of the Defendants and would have to be paid before the Defendants' could satisfy the mortgage debt following a foreclosure sale.  Nevertheless, the Court shall enter an order denying summary judgment on Count VII.

G. <u>Count VI-Economic Duress</u>

In his Verified Complaint, the Debtor stated that the loan he obtained "constitutes a disproportionate exchange of values."  Additionally, he complained that without the

distribution of cash in the amount that he was originally told he was to get he was not able to renovate his house for rental purposes, that the repayment of the loan was far beyond his ability to pay without rental income, and that there was a certainty that he would lose the equity in his house. Accordingly, he sought damages, as well as a judgment declaring the mortgage loan null and void.

The Defendants seek summary judgment with respect to Count VI arguing that they did not cause the financial circumstances which the Debtor claims pressured him into signing the loan documents. They add that "even if Laudani could establish duress, he ratified the transaction by accepting the benefits of the loan and failing to repudiate it for more than 18 months after the closing." In response, the Debtor, while admitting that he was under duress from other sources, maintains that the Defendants' delay in providing him with disclosures, until, at best, the closing, "left him with no reasonable choice but to close, let [sic] he lose his home to foreclosure."

In Cabot Corp. V. AVX Corp., 448 Mass. 629 (2007), the Supreme Judicial Court set forth the applicable law. It stated:

> It is well established that a contract entered into under duress is voidable. Barnette v. Wells Fargo Nev. Nat'l Bank, 270 U.S. 438, 444, 46 S.Ct. 326, 70 L.Ed. 669 (1926). Coveney v. President & Trustees of the College of the Holy Cross, 388 Mass. 16, 22, 445 N.E.2d 136 (1983), citing Avallone v. Elizabeth Arden Sales Corp., 344 Mass. 556, 561, 183 N.E.2d 496 (1962). Cappy's, Inc. v. Dorgan, 313 Mass. 170, 174, 46 N.E.2d 538 (1943). Freeman v. Teeling, 290 Mass. 93, 95, 194 N.E. 677 (1935). Restatement (Second) of Contracts § 175 (1981). See 7 A. Corbin, Contracts § 28.1 (rev. ed.2002); 28 S. Williston, Contracts § 71:3 at 431 (4th ed. 2003) (Williston). Such duress need not be physical; it may be economic in nature. International Underwater Contrs., Inc. v. New England Tel. & Tel. Co., 8 Mass.App.Ct. 340, 342, 393 N.E.2d 968 (1979) (International Underwater Contrs.), citing Struck Constr. Co. v. United

48

States, 96 Ct.Cl. 186, 220, 1942 WL 4411 (1942). "To show economic duress (1) a party 'must show that he has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered will,' " International Underwater Contrs., *supra*, quoting 13 S. Williston, Contracts § 1617, at 704 (3d ed.1970), resulting in the threatened party being "compelled to make a disproportionate exchange of values." International Underwater Contrs., *supra*, quoting 13 S. Williston, Contracts, *supra*.

"The elements of economic duress have also been described as follows: '(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.'" International Underwater Contrs., supra, quoting Urban Plumbing & Heating Co. v. United States, 187 Ct.Cl. 15, 408 F.2d 382, 389 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970). To show duress, a victim "must go beyond the mere showing of a reluctance to accept [and] financial embarrassment" and show that acts of the other party produced these factors. Williston, *supra* at § 71:7 at 449. Thus, "[i]n order to substantiate the allegation of economic duress or business compulsion ... [t]here must be a showing of acts on the part of the defendant which produced [the financial embarrassment]. The assertion of duress must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." International Underwater Contrs., *supra*, quoting W.R. Grimshaw Co. v. Nevil C. Withrow Co., 248 F.2d 896, 904 (8th Cir.1957).

Id. at 637-38.

As is evident from the list of elements sets forth by the Supreme Judicial Court, the Debtor failed to allege or submit evidence with respect to coercive acts or threats on the part of the Defendants, which deprived him of his will. The Debtor was well aware of the impending foreclosure sale when he contacted Manhattan, and, even if the closing attorney or someone else suggested to the Debtor that the foreclosure sale was imminent, the Court finds that that statement is not the type of coercive or unlawful act or threat that would give rise to liability on the part of the Defendants. The Defendants did not create the

problems that caused the Debtor to enter into the loan transactions.   The Defendants had

not scheduled the foreclosure sale which constrained the Debtor's options or borrowed

money from the Carpenter Trust at 18% interest.   Indeed, the Debtor admitted that he used

the proceeds from the Carpenter Trust loan to start an internet business instead of using

them to refurbish his Property.   Moreover, the Debtor failed to submit a scintilla of

evidence that a representative of Tribeca, as opposed to Walsh or a representative of

Manhattan, represented to him that he would be able to obtain $25,000 to $60,000 in cash

in view of the loan amount and the number of mortgages and encumbrances on the

Property.   Accordingly, the Court shall enter an order granting summary judgment to the

Defendants with respect to Count VI.

H. Count XII-Emotional Distress

Through Count XII, Laudani asserted that "[t]he actions of the defendants, as

described herein, caused Laudani to suffer emotional distress of a type and severity that

is unjustified, unreasonable and intolerable in a civilized society." The Debtor did not

differentiate between negligent or intentional infliction of emotional distress.   In their

Motion for Summary Judgment, the Defendants outlined the elements of causes of action

for negligent and intentional infliction of emotional distress, and argued that the Debtor

failed to satisfy applicable standards.

In Regan v. Beneficial Massachusetts, Inc. (In re Regan), No. 07-1308, 2008 WL

4373001 (Bankr. D. Mass. Sept. 22, 2008), this Court, quoting Payton v. Abbot Labs, 386

Mass. 540 (1982), stated:

50

"[A] plaintiff in order to recover for negligently inflicted emotional distress must prove the following: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." In Payton Labs, the court required the objective symptomatology to be substantiated by expert medical testimony, and to be reasonably foreseeable. Id. at 556-57. It also stated that emotional distress is reasonably foreseeable when there is a causal relationship between the physical injuries suffered and the emotional distress alleged. Id. at 556.

Regan, 2008 WL 4373001 at *14 n.14.  As noted by the court in Islam v. Option One Mortgage Corp., 432 F.Supp.2d 181, 195 n. 15 (D. Mass. 2006), "Massachusetts law . . . requires that a legal duty undergird a claim of negligent infliction of emotional distress." In Islam, the court scoured Massachusetts law, concluding that there was considerable uncertainty surrounding the existence of a duty for purposes of a negligence claim under Massachusetts law in the context of debt collection (as opposed to the context in this case, namely the making of a loan) by a secured creditor.  432 F.Supp.2d at 198. The court, in denying a motion to dismiss a claim for negligent infliction of emotional distress, concluded that it might consider it appropriate to certify the question of the existence of a duty to the Supreme Judicial Court, if the plaintiffs prevailed after trial.  Id.  Indeed, the court expressed hesitancy in finding a negligence duty based upon duties imposed by Massachusetts statutory law.  Noting that consumer protection statutes provide their own enforcement mechanism, the court stated "[t]o create a common-law negligence action based on these statutes would be to graft an unwritten remedy onto [sic] their enforcement scheme.  This the Court is unprepared to do." Id, at 196.

In this case, the Debtor did not plead the required elements of a claim for negligent

51

infliction of emotional distress and did not even consider the existence of a duty on the part of the Defendants in what is generally recognized as a contractual debtor-creditor relationship.  Moreover, the Debtor did not point to specific facts to establish the elements of a claim for negligent infliction of emotional distress.  Although he discussed health issues, he did not attach the affidavit of his treating physician or analyze causation in other than a conclusory fashion.  Indeed, his argument was limited to the statement that his "affirmation details the emotional distress this ordeal has caused him."  That statement is insufficient to create a genuine issue of material fact warranting trial on the merits.

In Regan, this Court also discussed intentional infliction of emotional distress.  The Court quoting Simon v. Solomon, 385 Mass. 91 (1982), stated:

> To recover for intentional infliction of emotional distress as an independent claim, the plaintiff must show the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; . . . (2) that the conduct was 'extreme and outrageous' . . .; (3) that the actions of the defendant were the cause of the plaintiff's distress; . . . and (4) that the emotional distress sustained by the plaintiff was 'severe' . . . ." 385 Mass. at 96 (citing Agis v. Howard Johnson Co., 371 Mass. 144-45 (1976) ). If each of these elements is proven, the plaintiff can recover for purely emotional suffering unaccompanied by physical injury. Id.

Regan, 2008 WL at *14 n.13.  See also Johnson v. Town of Nantucket, 550 F.Supp.2d 179, 183 (D. Mass. 2008).

The Debtor represented that the Defendants' conduct was "unjustified, unreasonable and intolerable."  The Court finds, as a matter of law, that the Debtor failed to substantiate with credible evidence that the Defendants' conduct in making the loan "was extreme, outrageous and beyond all possible bounds of decency."  See Taylor v. Swartwout, 445

52

F.Supp.2d 98, 105 (D. Mass. 2006). The Debtor pointed to no evidence in the record that the Defendants intended or knew or should have known that their actions in making a loan to Laudani would cause him emotional distress. The record does not support the conclusion that the loan was beyond the bounds of decency. Although the Debtor detailed manifestations of illnesses he suffered, he failed to submit evidence as to the causal connection between the loan from Tribeca, as opposed to his overall financial circumstances, including an impending foreclosure sale, a failed internet start-up company, and limited income from employment and rent, and his emotional distress. The Debtor's ability to resolve his financial crisis was severely circumscribed by his history of late and missing payments to both secured and unsecured creditors. The loan from Tribeca bought the Debtor time to address his financial problems, even though it did not yield the thousands of dollars he alleged he was told he would receive.[22] Although the Debtor indicated that he needed the money to make repairs to his Property, the Court notes that the Debtor is renting at least one unit of his multi-family home for $3,400 per month. Moreover, the Court notes that it is reasonable to infer that if the Debtor's Property needed repairs costing $25,000 to $60,000, it is unlikely that he could rent the units before the first mortgage payment came due under the Note. Although the Court must construe the evidence in the light most favorable to the Debtor, as noted in <u>Medina-Munoz</u>, 896 F.2d at 8, the Court need not accept the Debtor's unsupported allegations to establish a genuine

---

[22] Notably, the Debtor did not identify the person at either Manhattan or Tribeca who told him he would received thousands of dollars.

issue of material fact.   The Debtor submitted no evidence whatsoever about the condition

of his Property, its occupancy at the time of the loan transaction, and his expected rental

income which would have permitted him to pay his monthly mortgage obligation to

Tribeca.   Additionally, as noted by the court in <u>Nosek v. Ameriquest Mtg. Co. (In re</u>

<u>Nosek)</u>, No. 04-4517, 2006 WL 1867096 (Bankr. D. Mass. June 20, 2006), this Court is without

jurisdiction to hear a tort claim for intentional infliction of emotional distress.  *See* 28 U.S.C.

§ 157(b)(5).   Accordingly, the Court shall enter an order granting summary judgment with

respect to Count XII.

**V. CONCLUSION**

In view of the foregoing, the Court shall enter an order granting in part and denying

in part the Defendants' Motion for Partial Summary Judgment.   The Court shall enter an

order granting summary judgment with respect to Counts IV, VI, VIII, IX XII and denying

summary judgment with respect to Counts II as set forth in section IV.B of this

Memorandum and VII.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: January 16, 2009
cc: David G. Baker, Esq., Kevin P. Scanlon, Esq., Carolyn Bankowski, Esq.